Filed 9/12/22  P. v. Ramos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>JOSE LUIS RAMOS,<br><br>　　　　Defendant and Appellant. | F083939<br><br>(Super. Ct. No. M13886)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from an order of the Superior Court of Madera County.  Dale J. Blea, Judge.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Levy, Acting P. J., Meehan, J. and Snauffer, J.

<h1 style="text-align:center">STATEMENT OF APPEALABILITY</h1>

Jose Luis Ramos appeals, pursuant to Penal Code[1] section 1237, subdivision (b), from an appealable order of the superior court in a felony case.

<h1 style="text-align:center">STATEMENT OF THE CASE</h1>

### A. The 1997 Change of Plea and Sentence

The Madera County District Attorney alleged in an information that Ramos committed two counts of assault with a firearm (§ 245, subd. (a)(2); counts 1 & 2), and alleged enhancements to counts 1 and 2 for personal use of a firearm in commission of a felony (§ 12022.5, subds. (a), (d).) On July 23, 1997, Ramos pled no contest to count 1 and admitted the firearm enhancement in exchange for a five-year maximum sentence and dismissal of count 2. On September 16, 1997, the trial court sentenced Ramos to serve five years in state prison, consisting of two years on count 1 and three years on the firearm enhancement.[2] On October 14, 1998, this Court affirmed the judgment. (*People v. Ramos* (Oct. 14, 1998, F029574) [nonpub. opn.].)

### B. The 2021 Section 1473.7 Motion to Vacate

On October 28, 2021, Ramos filed a section 1473.7 motion to vacate his conviction on the grounds of inadequate advisement regarding immigration consequences. On February 4, 2022, the trial court found Ramos's motion factually unsupported and untimely.

<h1 style="text-align:center">STATEMENT OF FACTS</h1>

### A. The Facts Underlying the Change of Plea

On July 23, 1997, Ramos stipulated to the preliminary hearing evidence as the factual basis for his no contest plea to count 1 and admission of the firearm enhancement.

---

[1] All statutory references are to the Penal Code.

[2] Judge John W. DeGroot presided at the change of plea hearing; Judge Paul R. Martin pronounced sentence.

2.

According to the preliminary hearing testimony, Ramos and his wife J. had a daughter, E.R. J. lived with E.R. in an apartment in Chowchilla.

At about 10:00 p.m. on July 21, 1996, while J.'s friends A.G. and S.B. visited, Ramos entered J.'s residence without invitation. She ordered him out. J. and Ramos argued in front of the residence regarding their marriage. Ramos brandished a handgun and threatened to kill A.G.

J. told S.B. to call the police and to wake up A.G. A.G.'s brother, F., exited a nearby residence and approached Ramos and J. While F. and Ramos argued, A.G. exited J.'s residence. Ramos placed his gun on F.'s forehead and threatened to kill him. He also pointed the gun at A.G. and threatened him.

Ramos's brother, who had arrived at the scene, slapped J. and spit in her face. Ramos restrained J. from fighting with his brother.

Yelling "HB4L," which J. interpreted as "Home Boys for Life," Ramos fired his handgun, entered a car occupied by his brother and his brother's friend, and left the scene.

City of Chowchilla Police Department (CPD) Officer Kevin Weaver, who had approached the scene on foot, saw Ramos fire his handgun, discard it, and enter the passenger side of a black vehicle which then left the area. Weaver secured the discarded gun, a Grendel .380 caliber semiautomatic, before participating in an unsuccessful search for the black vehicle.

CPD Officer Gary Twitty spoke with J., who said that Ramos, prior to exiting the apartment, had asked "where's [A.G.]? I'm going to put a cap in his ass." Officers recovered a .380 caliber shell casing from the scene and found four rounds loaded in the gun.

**B. The Facts Relevant to the Section 1473.7 Motion**

1. The 1997 Change of Plea and Sentencing

At the July 23, 1997, change of plea hearing, Ramos submitted to the court a "Declaration Regarding Guilty Plea" form. Ramos had initialed a pre-written statement that "… if not a citizen, my plea may have the consequence of my deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States." He had also signed the form under a paragraph stating, "I have personally prepared and discussed with my attorney, or have read, discussed and had explained to me by my attorney, each of the above items, and I understand same. I have initialed each item as proof thereof. Further, I stipulate that this plea form be admitted into evidence in the taking of this plea." Counsel had signed the form under a paragraph stating that she reviewed the form with her client, and that she had "personally observed the defendant fill in and initial each item or read and initial each item, acknowledging explanation of the contents of each item …."

During the change of plea hearing, the following colloquy occurred:

> "COURT: All right. Ms. Thompson anything else that Mr. Ramos should be aware of?
>
> "COUNSEL: Only issue that Mr. Ramos had was the potential immigration consequences. We did discuss that.
>
> "COURT: All right. Mr. Ramos, you should understand that if you are not a citizen, a plea to the charge could have an effect upon your residence status. You could be denied naturalization as a United States citizen –
>
> "RAMOS: Yes.
>
> "COURT: – subjecting yourself to deportation. Do you understand that?
>
> "RAMOS: Yes."

4.

At the September 16, 1997, sentencing hearing, after imposing a five-year sentence and ordering payment of fines and fees, the court ordered "Ordered released to Immigration." Counsel inquired, "Your Honor, I don't understand the release to Immigration." The court responded, "[i]f he was born in Mexico – he claims citizenship. If he's a citizen they'll release him promptly. Let them make that determination." The hearing concluded without further discussion.

2. Post-Conviction Facts

On August 28, 2001, an immigration judge ordered Ramos's removal from the United States based on the conviction in this case.

Ramos's counsel in the 1997 case died in 2019.

3. Ramos's 2022 Testimony

(a) Background

Ramos had traveled from Mexico to the United States at age six. He became a permanent resident and obtained a GED.

Ramos married J. about one year prior to the 1996 assault. He worked in the Foster Farms sanitation division and worked for Friction making calipers for cars. He had a son who lived in Chowchilla and a daughter who lived with J. In 1997, at age 23, he changed his plea to no contest in the assault case.

As of February 4, 2022, Ramos lived in Mexico, where he worked in the construction industry and as a taxi driver.

(b) Immigration Consequences

Following Ramos's arrest, his mother hired attorney Linda A. Thompson to represent him. Thompson did not visit Ramos in custody. She spoke with him for approximately five minutes during his court appearances. On two occasions, she spoke with him for approximately three to five minutes prior to court appearances.

Thompson did not advise Ramos regarding the immigration consequences that might arise from accepting the prosecution's offer to resolve the case. In particular, she

did not advise that accepting the offer would result in his deportation from the United States. Thompson never asked Ramos if he had obtained United States citizenship. To Ramos's knowledge, Thompson never thought to inquire whether Ramos was a United States citizen. Ramos did not know that accepting the offer would cause immigration consequences that included deportation.

At sentencing on September 16, 1997, J. said that Ramos was from Mexico and asked, "what's going to happen?" Ramos told Thompson that "if this is going to affect my immigration status, there's no deal." Thompson told Ramos that authorities would release him from custody and place him on parole. After sentencing, the judge said Ramos would be released to immigration and "let them deal with it." This statement surprised Ramos and appeared to surprise Thompson.

### 4. The Superior Court's Reasoning

In denying Ramos's section 1473.7 motion, the court reasoned that, in the July 1997 change of plea hearing, Thompson had informed the court that she had discussed potential immigration consequences with Ramos. The court found that it could not "speculate that [Ramos and Thompson] didn't discuss those immigration consequences that Mr. Ramos was concerned about and that [Thompson] referenced in her statement."

The court also addressed Ramos's argument that Thompson had indicated a lack of comprehension regarding immigration issues when she had said, following sentencing, "Your Honor, I don't understand the release to immigration." The court reasoned that Thompson could have sought to clarify what the court had meant by the order "release to immigration" when the court had sentenced Ramos to serve five years in state prison.

The court also reasoned that, in the July 1997 change of plea hearing, Ramos could have informed the court if Thompson had lied regarding discussing immigration consequences with him. Ramos's silence in the change of plea hearing contradicted his current testimony that Thompson had never discussed immigration consequences.

6.

Finally, the court opined, "I think that the credibility of Mr. Ramos' testimony today is questionable. I understand why he – he would testify the way he did. I don't agree with it." The court continued, "I – don't – there's nothing to corroborate his testimony. As a matter of fact, the evidence is contrary to his testimony. I – I don't believe it."

## APPELLATE COURT REVIEW

Ramos's appointed appellate counsel has filed an opening brief that summarizes the pertinent facts, raises no issues, and requests this court to review the record independently. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) The opening brief also includes the declaration of appellate counsel indicating appellant was advised he could file his own brief with this court. By letter on June 22, 2022, we invited Ramos to submit additional briefing. To date, he has not done so.

Having undertaken an examination of the entire record, we find no evidence of ineffective assistance of counsel or any other arguable error that would result in a disposition more favorable to Ramos.

## DISPOSITION

The trial court's February 4, 2022, order is affirmed.